UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————— x
BRYAN D. FOAT, Individually and on Behalf :   Civil Action No.
of All Others Similarly Situated,        :
                                  :   <u>CLASS ACTION</u>
             Plaintiff,   :
                                  :   COMPLAINT FOR VIOLATIONS OF THE
   vs.                        :   SECURITIES ACT OF 1933
                                  :
QUDIAN INC., MIN LUO, CARL YEUNG, :
LIANZHU LV, YI CAO, SHILEI LI, LI DU, :
CHAO ZHU, TIANYU ZHU, DIANA ARIAS, :
MORGAN STANLEY & CO.         :
INTERNATIONAL PLC, CREDIT SUISSE :
SECURITIES (USA) LLC, CITIGROUP  :
GLOBAL MARKETS INC., CHINA    :
INTERNATIONAL CAPITAL        :
CORPORATION HONG KONG       :
SECURITIES LIMITED and UBS     :
SECURITIES LLC,             :
                                  :
             Defendants.  :
                                  :
——————————————————— x   <u>DEMAND FOR JURY TRIAL</u>

Plaintiff Bryan D. Foat ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings of Qudian Inc. ("Qudian" or the "Company"), the Company's press releases, and analyst reports, media reports and other publicly disclosed reports and information about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons who purchased Qudian American Depositary Shares ("ADSs") in or traceable to the Company's October 18, 2017 initial public offering (the "IPO") seeking to pursue remedies under the Securities Act of 1933 (the "1933 Act").

## JURISDICTION AND VENUE

2.      The claims alleged herein arise under §§11 and 15 of the 1933 Act, 15 U.S.C. §§77k and 77o.

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the 1933 Act.

4.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §22 of the 1933 Act because many of the acts and practices complained of herein occurred in substantial part in this District.

5.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.      Plaintiff Bryan D. Foat purchased Qudian ADSs traceable to the IPO and has been damaged thereby.

7.      Defendant Qudian is a financial lending company based in Beijing, China.  It conducted the IPO in New York and the ADSs sold in the IPO trade on the New York Stock Exchange ("NYSE") under the ticker symbol "QD."

8.      Defendant Min Luo ("Luo"), Qudian's founder, was Qudian's Chief Executive Officer ("CEO") and Chairman of the Board of Directors (the "Board") at the time of the IPO. Defendant Luo was also the controlling shareholder of the Company before and after the IPO by way of his ownership of Qudian Class B shares.

9.      Defendant Carl Yeung ("Yeung") was the Chief Financial Officer ("CFO") of the Company at the time of the IPO.

10.     Defendant Lianzhu Lv ("Lv") was a director and member of the Board at the time of the IPO.

11.     Defendant Yi Cao ("Cao) was a director and member of the Board at the time of the IPO.  Defendant Cao also sold Qudian shares in the IPO.

12.     Defendant Shilei Li ("Li") was a director and member of the Board at the time of the IPO.

13.     Defendant Li Du ("Du") was a director and member of the Board at the time of the IPO.  Defendant Du also sold Qudian shares in the IPO.

14.     Defendant Chao Zhu ("C. Zhu") was a director and member of the Board at the time of the IPO.

15.     Defendant Tianyu Zhu ("T. Zhu") was a director and member of the Board of the Company until September 2017.

16.     Defendant Diana Arias was the Company's Senior Manager at the time of the IPO.

17.     The defendants identified in ¶¶8-16 are referred to herein as the "Individual Defendants." The Individual Defendants signed the Registration Statement (defined below) and, as directors and/or executive officers of the Company, participated in the solicitation and sale of Qudian ADSs to investors in the IPO for their own benefit and the benefit of Qudian.

18.     Defendants Morgan Stanley & Co. International plc, Credit Suisse Securities (USA) LLC, Citigroup Global Markets Inc., China International Capital Corporation Hong Kong Securities Limited and UBS Securities LLC (collectively referred to as the "Underwriter Defendants") served as underwriters and underwriter representatives for the IPO and sold millions of shares of Qudian ADSs in the IPO, for which they received certain fees and commissions.

19.     The Underwriter Defendants drafted and disseminated the Registration Statement. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

## SUBSTANTIVE ALLEGATIONS

20.     Defendant Qudian is a lending company focused on providing small cash credit products to underserved borrows, such as those with less credit history, lower monthly incomes or limited access to traditional financial institutions. The Company claims that its unique focus on loan products with small ticket sizes, short duration and relatively low annual percentage rates ("APR") allows it to diversify credit risk, reduce the risk of fraud, accumulate borrowers' data and be more selective in borrower engagement.

21.     In 2015, Qudian established a strategic partnership with Ant Financial, one of its principal shareholders.  Alipay, operated by Ant Financial, is a leading online and mobile third-party payment service provider in China.  The Company engages the majority of its active borrowers through the Alipay consumer interface, which has significantly contributed to the Company's rapid growth.  The Company also collaborates with Zhima Credit, a credit assessment service provider operated by Ant Financial.  Following Qudian's partnership with Ant Financial, its number of active borrowers grew from only 250,000 in September 2015 to more than 5.5 million by June 2017.

22.     The Company took a number of steps leading up to the IPO to reassure investors that it had minimized regulatory risk and that its rapid growth rate was the product of legitimate and sustainable business practices.  For example, while historically the Company also provided peer-to-peer and campus credit lending services, these services were phased out in the months preceding the IPO, partly in a response to increased governmental regulations and a ban on online lending to college students initiated by the Chinese government. In addition, the Company capped its APR at 36%, obtained licenses for online small-credit business and claimed that it employed user-friendly collection methods, such as non-threatening text and telephone reminders.

23.     On September 18, 2017, the Company filed with the SEC a registration statement on Form F-1 for the IPO, which, after several amendments, was declared effective on October 17, 2017 (the Form F-1, together with all amendments, is referred to herein as the "Registration Statement"). The next day, the Company filed a prospectus for the IPO on Form 424B4 which incorporated and formed part of the Registration Statement (the "Prospectus").  Together, the Registration Statement and Prospectus were used to sell to the investing public approximately 37.5 million Qudian ADSs, representing 37.5 million Qudian Class A ordinary shares, at $24 per share.

- 4 -

24.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents.

25.     For example, the Registration Statement stated that the Company had experienced rapid growth in revenues, net income and active users in the years leading up to the IPO, but failed to disclose that this growth had been fueled by improper lending, underwriting and collection practices. The Registration Statement stated the following in pertinent part:

> We are the largest online provider of small cash credit products in China in terms of the number of active borrowers and the amount of transactions in the six months ended June 30, 2017, according to the Oliver Wyman Report.  In the six months ended June 30, 2017, we facilitated approximately RMB38.2 billion (US$5.6 billion) in transactions to 7.0 million active borrowers.
>
> *                *                *
>
> **Since inception in 2014, our business has witnessed significant growth and increased borrower activities, as illustrated by the charts below**:











\*         \*         \*

We have achieved significant scale and experienced strong growth in our results of operations.  Our total revenues increased from RMB24.1 million in the period from April 9 to December 31, 2014 to RMB235.0 million in 2015.  Our total revenues further reached RMB1,442.8 million (US$212.8 million) in 2016, which was 514.0% higher than our total revenues in 2015. ***Our total revenues increased by 393.3% from RMB371.6 million in the six months ended June 30, 2016 to RMB1,833.1 million (US$270.4 million) in the same period in 2017.***  Our net losses were RMB40.8 million in the period from April 9 to December 31, 2014 and RMB233.2 million in 2015. In 2016, we recorded net income of RMB576.7 million (US$85.1 million). ***Our net income increased by 695.2% from RMB122.4 million in the six months ended June 30, 2016 to RMB973.7 million (US$143.6 million) in the same period in 2017.***

- 6 -

\*      \*      \*

**Six Months Ended June 30, 2017 Compared to Six Months Ended June 30, 2016**

*Total revenues.  Our total revenues increased from RMB371.6 million in the six months ended June 30, 2016 to RMB1,833.1 million (US$270.4 million) in the same period in 2017 primarily due to increase in financing income from RMB324.0 million in the six months ended June 30, 2016 to RMB1,527.4 million (US$225.3 million) in the same period in 2017 as a result of the substantial increase in amount of transactions from approximately RMB9.4 billion in the six months ended June 30, 2016 to RMB35.4 billion (US$5.2 billion) in the same period in 2017.  The increase in amount of transactions was due to the substantial increase in the number of active borrowers from 2.5 million in the six months ended June 30, 2016 to 7.0 million in the same period in 2017.  Such increase in the number of active borrowers was primarily the result of (i) the shift of our target borrower base from college students to young consumers in general and (ii) increase in borrower engagement efficiency.  The attractiveness of our products and our brand value also led to an increase in drawdowns by borrowers of their credit.*  The number of transactions per active borrower increased to 5.8 in the six months ended June 30, 2017 from 4.5 in the same period in 2016.  Such short-term credit drawdowns generated lower revenue per transaction, partially offsetting the higher revenue driven by increasing number of transactions.

26.     The Registration Statement also stated that the Company focused on borrowers with

"*emerging prime credit quality*" who had been underserved by traditional financial institutions.  The

Registration Statement stated that Qudian used technology to make "*personalized credit accessible*"

to this underserved segment of borrowers.  The Registration Statement stated in pertinent part:

*We target hundreds of millions of quality, unserved or underserved consumers in China*.  They are young, mobile-active consumers who need access to small credit for their discretionary spending but are underserved by traditional financial institutions due to their lack of traditional credit data and the operational inefficiency of traditional financial institutions.  We believe our operating efficiency and big data analytics capability to understand our prospective borrowers from different behavioral and transactional perspectives, assess their credit profiles and offer them instantaneous and affordable credit products with customized terms distinguishes our business and offerings.

\*      \*      \*

*We target the large and growing number of creditworthy borrowers in China who we believe are of emerging prime credit quality but have limited credit history and access to traditional consumer credit from banks or other lenders*.  As we have been focused on providing credit products to young consumers across

China, we have gained extensive experience and understanding into the behavior and consumption preference of such demographic of users since our inception.  In the six months ended June 30, 2017, approximately 90.8% of active borrowers are between 18 and 35 years of age.

27.    In addition, the Registration Statement stated that Qudian employed robust credit assessment and monitoring tools, "big data" analytics and a variety of other techniques to ensure that it was only making loans to borrowers who had demonstrated the ability and "willingness" to repay the loans.  The Registration Statement stated the following in pertinent part:

> We aggregate our borrowers' behavioral data with data and credit analyses from various partners as inputs for our credit assessment model.  As an innovator in the application of artificial intelligence to financial services, ***we utilize machine learning to accurately assess borrowers' credit profiles.  We focus on data analyses that not only reflect borrowers' ability to repay but also their willingness to do so. These analyses are based on the prospective borrowers' social and shopping behavioral data, among others, in addition to the characteristic metrics such as locations and demographics***.  We have increased the number of variables analyzed by our credit assessment system from a few to several hundred for each transaction, and we assign each borrower a personalized credit limit based on his or her credit profile.  As borrowers repay, they build credit histories with us.  Based on the credit histories, our artificial intelligence-based credit assessment model enables us to continually re-evaluate borrowers' credit profiles and provide more personalized credit limits.  We offer borrowers with stronger credit profiles higher credit limits and longer repayment durations, thereby driving higher engagement with them.

> \*        \*        \*

> Our mission is to use technology to make personalized credit accessible.  ***To accomplish this, we employ big data-enabled technologies, such as artificial intelligence and machine learning, to assess credit quality, and then offer small credit products to quality, unserved or underserved consumers in China.***  We believe there is a large unmet demand of small credit from the young, mobile-active consumers in China for their frequent discretionary spending, which can only be served with the power of big data and technologies in a cost efficient way.  ***Our big data analytics utilizes distributed computing and machine learning to analyze correlations between users' behavior and their willingness and ability to repay***. For such analysis, we leverage our online model to aggregate a broad range of data, including users' behavior in filling out applications, repayment performances from completed borrowing cycles, social activity information, online retail and mobile commerce transaction activity information, credit analysis from other parties such as Zhima Credit and other leading anti-fraud institutions in China.  Such analysis constitutes the core input of our credit assessment model and risk management system and also helps us make decisions regarding product design and business

focus. The results of such analysis drive constant improvements to our credit decisioning process, as well as adaptations of attributes of merchandises most attractive to borrowers, thereby enhancing the desirability of our credit products.

**Effective Data-Driven Analytics and Credit Assessment Model**

> ***We developed a rigorous credit assessment model and robust risk management system***. Our model and system allow us to innovate the way user credit profile is assessed by analyzing a variety of behavioral data typically ignored by traditional financial institutions. Machine learning enables us to draw insights from the high volume of transaction data that we collect. ***We continuously test, validate and optimize this model and system by changing the types of data we analyze***. In particular, as we identify creditworthy borrowers whom our model previously regarded as risky and raise the credit limits for quality borrowers, we are able to increase the amount of transactions without undertaking significantly more risk. Since inception, we have been able to expand the granularity of our credit assessment model to further refine the risk levels of prospective borrowers in a continuous self-reinforcing manner. We have increased the number of variables analyzed by our credit assessment system from a few to several hundred for each transaction, and we assign each borrower a personalized credit limit based on his or her credit profile. For example, prospective borrowers with the same Zhima Credit Score may receive different credit limits that carry different repayment terms and financing service fees. As borrowers repay they build credit histories with us. Based on the credit histories, our artificial intelligence-based credit assessment model enables us to continually re-evaluate borrowers' credit profiles and provide more personalized credit limits. We offer borrowers with stronger credit profiles higher credit limits and longer repayment durations, thereby driving higher engagement with them.

28.     Similarly, the Registration Statement claimed that Qudian's focus on micro-loans with short durations further decreased credit risk and increased the credit quality of the Company's customers. The Registration Statement stated the following in pertinent part:

> Small credit products serve consumers' immediate needs for discretionary consumption. They typically have short durations, enabling us to quickly understand a borrower's behavior and further refine our data analytics and credit assessment model upon the completion of transaction cycles. On average, an active borrower drew down credit approximately six times in the six months ended June 30, 2017. As of June 30, 2017, borrowers with outstanding credit drawdowns utilized approximately 51.3% of their credit limits on average. We believe borrowers who did not utilize the maximum amounts available for drawdowns under their respective credit limits tend to be those who utilize credit responsibly.

\*         \*         \*

- 9 -

We offer small-sized cash credit products and merchandise credit products. In the six months ended June 30, 2017, our cash credit products had an average size of approximately RMB920 (US$136) and weighted average term of approximately two months, and our merchandise credit products had an average size of approximately RMB1,250 (US$184) and weighted average term of approximately eight months. ***Small credit products enjoy favorable risk characteristics compared to larger credit products. A borrower is more likely to repay a smaller amount timely to maintain the quality of his or her credit profile, which may impact future borrowing activities. Benefits to fraudulent borrowers are also limited given the small amount of money borrowed. The short-term nature of our credit products contributes to frequent repayments and repeat borrowing activities, which drive the volume and comprehensiveness of the data we collect and analyze.*** During the three months ended June 30, 2017, we processed an average of 9,521 credit drawdowns and 21,482 repayments per hour. Our machine learning-based approach enables us to continuously refine our credit assessment model based on insights from the high volume of transaction data that we collect.

29.     Furthermore, the Registration Statement stated that the Company's robust credit assessment processes and procedures and relatively  high credit quality customers had allowed it to enjoy a low delinquency rate. For example, the Registration Statement claimed that the Company had only a 0.5% or less M1+ Delinquency Rate for vintages in 2016 and the first quarter of 2017.[1] The Registration Statement stated the following in pertinent part:

With respect to on-balance sheet transactions, principal for which any installment payment was more than 30 calendar days past due accounted for 0.05%, 0.92%, 1.29% and 1.14% of total outstanding principal as of December 31, 2014, 2015 and 2016 and June 30, 2017, respectively.

*        *        *

***M1+ Delinquency Rate by Vintage for vintages in 2016 and the first quarter in 2017 have remained at a level of 0.5% or less up to June 30, 2017 as a result of our effective credit assessment model and risk management system despite serving a more diverse customer group***. After we started to engage borrowers online in November 2015, we have fully automated our data collection and risk management process and placed increasing emphasis on big data analytics. M1+ Delinquency

---

[1]     The Company defines the M1+ Delinquency Rate by Vintage as the total balance of outstanding principal of a vintage for which any installment payment is over 30 calendar days past due as of a particular date (adjusted to reflect the total amount of recovered past due payments for principal and without taking into account charge-offs), divided by the total initial principal in such vintage.

Rate by Vintage for the fourth quarter of 2016 is higher than other vintages in 2016 primarily due to a significant increase in the amount of transactions within a concentrated short period during the quarter, as we aimed to satisfy the increased borrower demand during November 11 and December 12 shopping seasons. The amount of transactions further increased in the first quarter of 2017, while M1+ Delinquency Rate by Vintage for such quarter slightly decreased compared to the fourth quarter of 2016, which demonstrates the strength of our credit assessment model.

30.     In addition, the Registration Statement stated that the Company no longer provided online loans to college students. For example, the Registration Statement stated that Qudian had "**terminated** [its] initial business of facilitating credit to college students on campuses across China" and instead had "shifted [its] focus to a broader base of young consumers in China starting from November 2015." The Registration Statement also stated that this shift was a primary driver of the Company's recent revenue and active borrower growth.

31.     The Registration Statement also claimed that the Company employed user-friendly and non-threatening debt collection methods that complied with applicable laws and regulations. For example, the Registration Statement stated that Qudian and its employees "aim to ensure our collection efforts **comply with the relevant laws and regulations** in the PRC and we have established **strict internal policies that our collections personnel do not engage in aggressive practices**." The Registration Statement continued in pertinent part:

**Our business depends on our ability to collect payment on and service the transactions we facilitate**.

> ***We have implemented payment and collection policies and practices designed to optimize regulatory compliant repayment, while also providing superior borrower experience.*** Our collection process is divided into distinct stages based on the severity of delinquency, which dictates the level of collection steps taken. For example, automatic reminders through text, voice and instant messages are sent to a delinquent borrower as soon as the collections process commences. Our collection team will also make phone calls to borrowers following the first missed payment and periodically thereafter. Our collection team also disclose such delinquency to Zhima Credit if a payment is more than 20 calendar days past due. For amounts more than 90 calendar days past due, we continue to contact the relevant borrowers by phone. For larger amounts past due, we may also conduct in-

person visits.  During 2015, 2016 and the six months ended June 30, 2017, we recovered RMB0.9 million, RMB7.4 million (US$1.1 million) and RMB7.8 million (US$1.2 million), respectively, of principal and financing service fees of on-balance sheet transactions for which any installment payment is more than 90 calendar days past due.

*        *        *

A majority of our risk management team members are responsible for credit management and collection.  We have implemented payment and collection policies and practices, included through automated repayment process in which borrowers authorize deduction from their Alipay accounts for the amount of scheduled repayments.  ***These policies and practices are designed to optimize regulatory compliant repayment, while also providing superior borrower experience.***  We operate centralized collection teams within our two call centers.  Our collections teams are trained to help borrowers to understand the value of their credit profile, explore available payment alternatives and make reasonable arrangements to repay outstanding balances.  Call center employees contact borrowers following the first missed payment and periodically thereafter.  Our primary methods of contacting past due borrowers are to send reminders through text, voice and instant messages, phone calls, letters and emails.

32.     Furthermore, the Registration Statement highlighted the Company's relationship with Ant Financial and Alipay, listing the partnership as a key competitive "strength" that "contribute[s] to our success and reinforce[s] our market leading position."  Likewise, the Registration Statement stated that Qudian had "***established a strategic partnership with Ant Financial . . . and ha[d] in-depth cooperation in multiple areas of our business***."  The Registration Statement continued in pertinent part:

> ***We have established a strategic partnership with Ant Financial, one of our principal shareholders, and have in-depth cooperation in multiple areas of our business***.  Alipay, operated by Ant Financial, is a leading online and mobile third-party payment service provider in China.  ***We engage the majority of our active borrowers through the Alipay consumer interface, which has significantly contributed to our rapid growth***.

*        *        *

> We have established a strategic partnership with Ant Financial.  Our collaboration with Ant Financial has an important effect on our results of operations.  ***We benefit from Alipay's strong brand recognition and wide adoption in China***.  In particular, we are able to promote our products and launch campaigns through the

- 12 -

public service window on the Alipay consumer interface, a borrower engagement channel which is free of charge and generally available to third parties.  We have been able to engage the majority of our active borrowers, particularly repeat borrowers, through such channel since 2016.  ***Such collaboration with Alipay has been an important factor in expanding our borrower base while controlling our sales and marketing expenses***.

*     *     *

In 2015, we approached Ant Financial for a potential partnership of business cooperation.  We have established a rapidly expanding business as a provider of online credit products and demonstrated strong capabilities in data technology and risk management.  ***Ant Financial, which operates Alipay, offers us valuable channels to engage Alipay's large number of users.  Furthermore, Alipay requires its users to provide personal identification information and verifies such information, which differentiates Alipay from its competitors and contributes to our risk management efforts***.  Furthermore, Ant Financial and us agreed to strengthen the strategic partnership through an equity investment by Ant Financial. . . .

. . . Alipay is a leading online and mobile payment service provider in China, which we believe is a highly efficient channel in enabling us to engage prospective borrowers.  At the same time, we believe our credit products enhance user awareness and engagement of Alipay, thereby creating a mutually beneficial relationship.

33.    The Registration Statement also stated that the Company's "business and operations ***may*** be adversely affected" "***if***" the Company was "unable to protect the confidential information of [its] users."  Similarly, the Registration Statement stated that "***if***" its security measures were breached, such a breach "***could***" expose the Company to "the loss of the information, time-consuming and expensive litigation and negative publicity" and the Company's "relationships with users ***could*** be severely damaged, we could incur significant liability and our business and operations could be adversely affected."  While the Registration Statement acknowledged the material importance to investors of protecting Qudian's customer information and preventing the leak of customer data, it failed to disclose that such a breach had already occurred and compromised nearly one million borrower accounts, rendering the conditional statements of potential harm in the Registration Statement themselves materially misleading.

34.     Similarly, while the Registration Statement stated that the Company was subject to changing laws and regulations in China that "may" affect the Company, the Registration Statement failed to disclose that Qudian was engaged in a host of improper lending, credit assessment and loan collection practices that increased the risk that governmental and regulatory changes would adversely affect the Company's business, operations and prospects.  To the contrary, the Registration Statement stated that new laws and regulations "*could also provide new product and market opportunities*" for Qudian.

35.     The statements identified in ¶¶25-34 were inaccurate statements of material fact because they failed to disclose, *inter alia*, the following facts that existed at the time of the IPO:

(a)     that the Company was engaged in predatory lending practices that saddled subprime borrowers and/or those with poor or limited credit histories with high interest rate debt that they could not repay;

(b)     that many of the Company's customers were using Qudian-provided loans to repay their existing loans, thereby inflating the Company's revenues and active borrower numbers and increasing the likelihood of defaults;

(c)     that the Company was providing online loans to college students despite a governmental ban on the practice;

(d)     that the Company was engaged overly aggressive and improper collection practices;

(e)     that the Company had understated the number of its non-performing loans in the Registration Statement and Prospectus;

(f)     that because of the Company's improper lending, underwriting and collection practices it was subject to a heightened risk of adverse actions by Chinese regulators;

(g)     that the Company's largest sales platform and strategic partner, Alipay and Ant Financial, could unilaterally cap the APR for loans provided by Qudian;

(h)     that the Company had failed to implement necessary safeguards to protect customer data; and

(i)     that data for nearly one million Company customers had been leaked for sale to the black market, including names, addresses, phone numbers, loan information, accounts and, in some cases, passwords to CHIS, the state-backed higher-education qualification verification institution in China, subjecting the Company to undisclosed risks of penalties and financial and reputational harm.

36.     Moreover, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii), requires defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations."   Similarly, Item 503 of SEC Regulation S-K, 17 C.F.R. §229.503, requires, in the "Risk Factor" section of registration statements and prospectuses, "a discussion of the most significant factors that make the offering speculative or risky" and requires each risk factor to "adequately describe[] the risk."   The failure of the Registration Statement to disclose the facts listed in ¶35 violated 17 C.F.R. §229.303(a)(3)(ii), because these undisclosed facts would (and did) have an unfavorable impact on the Company's sales, revenues and income from continuing operations.   This failure also violated 17 C.F.R. §229.503, because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in Qudian ADSs speculative or risky.

37.     On December 12, 2017, Qudian ADSs closed at $13.19 per ADS.  This price represented a *45% decline* from the price at which Qudian ADSs had been sold to the investing public less than two months earlier in the IPO.

## CLASS ACTION ALLEGATIONS

38.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons or entities who purchased Qudian ADSs pursuant and/or traceable to IPO (the "Class").  Excluded from the Class are defendants and their families, the officers, directors and affiliates of the defendants, at all relevant times, and members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

39.     The members of the Class are so numerous that joinder of all members is impracticable.  Qudian ADSs are actively traded on the NYSE and millions of shares were sold in the IPO.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Qudian or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

40.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

41.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

42.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether defendants violated the 1933 Act;

(b)     whether statements made by defendants to the investing public in the Registration Statement misrepresented material facts about the business, operations and risks of investing in Qudian; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

43.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violations of §11 of the 1933 Act
### Against All Defendants

44.     Plaintiff repeats and realleges ¶¶1-43 by reference.

45.     This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.

46.     This Count does not sound in fraud.  Plaintiff does not allege that the Individual Defendants or the Underwriter Defendants had scienter or fraudulent intent, which are not elements of a §11 claim.

- 17 -

47.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

48.     Qudian is the registrant for the IPO.  The defendants named herein were responsible for the contents and dissemination of the Registration Statement.

49.     As the issuer of the shares, Qudian is strictly liable to plaintiff and the Class for the misstatements and omissions.

50.     None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

51.     By reason of the conduct alleged herein, each defendant violated, and/or controlled a person who violated, §11 of the 1933 Act.

52.     Plaintiff purchased Qudian ADSs pursuant and/or traceable to the Registration Statement for the IPO.

53.     Plaintiff and the Class have sustained damages.  The value of Qudian ADSs has declined substantially subsequent to and due to defendants' violations.

54.     At the time of their purchases of Qudian ADSs, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.  Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff filed this complaint. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff filed this complaint.

## COUNT II

### For Violation of §15 of the 1933 Act
### Against Qudian and the Individual Defendants

55.     Plaintiff repeats and realleges ¶¶1-54 by reference.

56.     This Count is brought pursuant to §15 of the 1933 Act against Qudian and the Individual Defendants.

57.     The Individual Defendants each were control persons of Qudian by virtue of their positions as directors and/or senior officers of Qudian.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Qudian.  In addition, defendant Luo maintained voting control of the Company by way of his ownership of Class B voting shares.  The Company, meanwhile, controlled the Individual Defendants and all of its employees.

58.     The defendants named herein each were culpable participants in the violations of §11 of the 1933 Act alleged in the Count above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process that allowed the IPO to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  December 18, 2017          ROBBINS GELLER RUDMAN
                                                                    & DOWD LLP
                                              SAMUEL H. RUDMAN

*/s/ Samuel H. Rudman*
SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID C. WALTON
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

HOLZER & HOLZER, LLC
COREY D. HOLZER
1200 Ashwood Parkway, Suite 410
Atlanta, GA  3038
Telephone:  770/392-0090
770/392-0029 (fax)

Attorneys for Plaintiff

- 20 -

**CERTIFICATION OF NAMED PLAINTIFF**
**PURSUANT TO FEDERAL SECURITIES LAWS**

The undersigned declares, as to the claims asserted under the federal securities laws, that:

Plaintiff has reviewed the initial complaint filed in this action.

Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows:

Purchases:

| Name of Company | Date(s) Purchased | # Shares Purchased | Cost/Share |
|---|---|---|---|
| QD | 11/13/2017 | 600 | $28.59 |
| | 11/27/2017 | 1950 | $14.00 |

Sales:

| Name of Company | Date(s) Sold | # Shares Sold | Proceeds/Share |
|---|---|---|---|
| QD | | | |

During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

None

Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this *13* day of December, 2017 in Huntington Beach, California.

(Signature) X _____ *Bryan D. Foat* _____
DocuSigned by:
0B4C5E0A95C7421...

(Print Name) _____ Bryan Foat _____